UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CONSERVATION CONGRESS,

Plaintiff,

v.

MERV L. GEORGE, JR., et al.,

Defendants.

Case No. 14-cv-01979-TEH

**ORDER DENYING PLAINTIFF'S AND GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

This case came before the Court on May 4, 2015, on the parties' cross-motions for summary judgment. After carefully considering the arguments of the parties in the papers and at the hearing, the Court now DENIES Plaintiff's motion and GRANTS Defendants' cross-motion for summary judgment, for the reasons set forth below.

**BACKGROUND**

This matter concerns whether the U.S. Forest Service ("Forest Service") and U.S. Fish & Wildlife Service ("Fish & Wildlife Service") (collectively "agencies" or "Defendants") adequately considered the environmental effects of the Kelsey Peak timber project ("Project") in the Six Rivers National Forest ("Forest"). The Forest and the Project are located near the city of Eureka in Northern California. FS000200.[1]

The Forest is governed by the Six Rivers National Forest Land and Resource Management Plan, which sets guidelines for forest management practices. FS016981 *et seq.* Additional guidelines for the protection of Northern Spotted Owl habitat in the Forest are established by the Northwest Forest Plan Record of Decision. FS017823 *et seq.* The

---

[1] In citing the administrative record, the Court uses the same Bates-number designations as the parties did in their briefs: the "FS" prefix refers to Forest Service documents, and "FWS" refers to Fish & Wildlife Service documents.

United States District Court
Northern District of California

1  Land and Resource Management Plan and Forest Plan Record of Decision are collectively

2  referred to as the "Forest Plan."

3     The Project has two stated purposes: (1) to "Provide timber commodities that

4  contribute towards the Forest's sustainable supply goals to help support local economies;"

5  and (2) to "Provide fuelbreaks along strategic road corridors to improve fire protection and

6  human safety for both the forest and adjacent communities."  FS000159.  To achieve these

7  goals, the Project proposes "thinning from below," or selectively harvesting the smaller

8  trees in an area, in 1,718 acres in the Forest, as well as performing "Fuelbreak treatments"

9  in 2,192 acres, approximately 399 of which overlap with the commercial harvest acres.

10  FS000160.  The Project will also construct 2.6 miles of temporary roads, occupying 16.9

11  acres of land area.  *Id.*

12     "The entire project occurs in 2012 northern spotted owl critical habitat."  FS000288.

13  The Northern Spotted Owl ("Owl") is listed as a "threatened" species under the

14  Endangered Species Act.  50 C.F.R. § 17.11 (1990).  The Fish & Wildlife Service

15  promulgated a Recovery Plan for the Owl in 2011, which lists Recovery Actions that must

16  be taken to promote the Owl's recovery, including monitoring risks from a competitor

17  species, the Barred Owl.  FS015734 *et. seq.*; FS015835.

18     Because of the Owl's status as a threatened species, the Forest Service performed a

19  biological assessment of the Project's impacts on the Owl, in which it concluded that the

20  Project "May Affect but [is] Not Likely to Adversely Affect" the Owl.  FS001407.  The

21  Forest Service requested the Fish & Wildlife Service to concur with this determination,

22  and thereby conclude the "informal consultation" between the agencies.  FWS000557.

23  However, the Fish & Wildlife Service determined that "formal consultation was

24  warranted," given the Project's proximity to other projects.  FWS000625.  The Fish &

25  Wildlife Service subsequently issued a biological opinion in which it concluded that "the

26  proposed action is not likely to jeopardize the continued existence of the northern spotted

27  owl or result in adverse modification of designated critical habitat for the northern spotted

28  owl."  FWS000637.

United States District Court
Northern District of California

The Project also falls within the habitat of the Northern Goshawk.  FS000315.  The Northern Goshawk is not a listed species under the Endangered Species Act, but it is designated as a "sensitive species" under the Forest Plan.  FS017011.  The Forest Service evaluated the effects of the Project on the Northern Goshawk and determined that the Project "may impact individuals, but is not likely to result in a trend toward Federal listing or loss of viability for the goshawk in the Forest Plan area."  FS000323.

Management activities in the Forest that impact water quality are governed by a 2010 Waiver of Waste Discharge Requirements.  FS001767.  The Forest Service stated that it will submit an application to include the Project in the Waiver after the final record of decision for the Project was signed, which occurred in April of 2014.  FS000418; FS000155.  The Forest Service developed a set of "best management practices . . . for the protection of soil and water resource values" which are incorporated into the Project. FS001576-85.  Management activities must also comply with the Aquatic Conservation Strategy, and the Forest Service determined that "This project is consistent with the Aquatic Conservation Strategy because it is designed to contribute to maintaining or restoring both the conditions of the planning area and the conditions of the watershed as a whole, with only minor short-term negative effects."  FS000424.

Plaintiff, an environmental conservation organization, alleges that the agencies' environmental review was deficient under the Endangered Species Act, the National Forest Management Act, and the National Environmental Policy Act.  Plaintiff's Mot. at 9 (Docket No. 31).  Plaintiff argues that these violations require an injunction stopping the Project from going forward.  *Id.*  Defendants cross-move for summary judgment on all of Plaintiff's claims.  Def.'s Cross-Mot. at viii (Docket No. 33).

**LEGAL STANDARD**

Challenges to agency action under the Endangered Species Act, National Forest Management Act, and National Environmental Policy Act are governed by the Administrative Procedure Act.  *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d

3

581, 601 (9th Cir. 2014) (ESA and NEPA claims); *Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1013 (9th Cir. 2012) (NFMA and NEPA claims).  Under the Administrative Procedure Act, a court should only set aside agency action if the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); 16 U.S.C. § 1855(f)(1)(B) (adopting the standards for judicial review under 5 U.S.C. § 706(2)).  This is a "highly deferential" standard of review, and an agency's action is presumed to be valid and should be affirmed "if a reasonable basis exists for its decision."  *Indep. Acceptance Co. v. California*, 204 F.3d 1247, 1251 (9th Cir. 2000) (internal quotation marks and citation omitted).

"In conducting an APA review, the court must determine whether the agency's decision is founded on a rational connection between the facts found and the choices made[,] and whether the agency has committed a clear error of judgment."  *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010) (quotation and citation omitted).  "The agency's action need only be a reasonable, not the best or most reasonable, decision."  *Id.* (quotation and citation omitted).  "[W]hen reviewing scientific judgments and technical analyses within the agency's expertise, the reviewing court must be at its most deferential."  *Conservation Congress v. Finley*, 774 F.3d 611, 617 (9th Cir. 2014) (quotation and citation omitted).

At the same time, courts "must not 'rubber-stamp' administrative decisions that [they] deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute."  *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 859 (9th Cir. 2005) (quotation and citation omitted).

"[S]ummary judgment is an appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did."  *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 770 (9th Cir. 1985).  Review is generally "limited to the administrative record on which the agency based the challenged decision."  *Fence Creek Cattle Co. v. U.S. Forest Serv.*, 602 F.3d 1125, 1131 (9th Cir. 2010).

United States District Court
Northern District of California

DISCUSSION

## I.   PLAINTIFF'S ENDANGERED SPECIES ACT CHALLENGES FAIL

Plaintiff brings four challenges under the Endangered Species Act: (1) Defendants did not adhere to the procedural requirements of formal consultation; (2) Defendants failed to consider the recommendations of a White Paper regarding the Owl or the negative effects of thinning Owl habitat; (3) the Project proposes thinning Owl habitat to tree densities below the relevant habitat definitions; and (4) the Project does not monitor threats to the Owl from the Barred Owl.  Each of these claims fails.

## A. Endangered Species Act Requirements

Before a federal agency takes an action on land that has been designated as "critical habitat" of an endangered or threatened species, the agency must ensure that the action will not "jeopardize the continued existence" of the species or "result in the destruction or adverse modification" of critical habitat.  16 U.S.C. § 1536(a)(2).  In evaluating potential actions under the Endangered Species Act, "each agency shall use the best scientific and commercial data available."  *Id.*

"Adverse modification" of critical habitat is a term of art; it only applies when an action "appreciably diminishe[s]" the value of the habitat.  *Conservation Cong. v. U.S. Forest Serv.*, 720 F.3d 1048, 1050 (9th Cir. 2013).  In *Conservation Congress*, one of Plaintiff's previous cases, the Ninth Circuit rejected Plaintiff's argument that thinning Owl habitat below the recommended tree density necessarily constituted adverse modification of habitat, because tree density is only one factor among several to be considered in a general characterization of habitat.  *Id.* at 1057.  The court upheld Defendants' determination that such thinning, along with removing small amounts of habitat for helicopter landings and fuelbreaks, was not adverse modification, because the surrounding area could adequately support the local Owl population.  *Id.* at 1057-58 ("Even completely

5

destroying 22 acres of critical habitat does not necessarily appreciably diminish the value of the larger critical habitat area.").

The Endangered Species Act and its implementing regulations set forth the procedure that agencies must follow in evaluating actions. The agency proposing an action prepares a "biological assessment," in which it evaluates the effects of the proposed action. 50 C.F.R. § 402.12(a). If the agency determines that an action is not likely to adversely affect a threatened or endangered species, it can obtain the written concurrence of the Fish & Wildlife Service, and thereby complete "informal consultation" for the action. *Id.* §§ 402.12(k)(1), 402.13(a), 402.14(b)(1).

If the agency determines that the action may adversely affect a threatened or endangered species, or if the Fish & Wildlife Service disagrees about whether the action is "not likely to adversely affect" such a species, the agencies must undergo "formal consultation." *Id.* § 402.14. In the formal consultation process, the Fish & Wildlife Service prepares a "biological opinion," in which it evaluates the effects of the proposed action. 16 U.S.C. § 1536(a)-(b). If the Fish & Wildlife Service determines in the biological opinion that the action "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species," then the agency has satisfied its obligations under the Endangered Species Act unless the circumstances change. 50 C.F.R. §§ 402.15, 402.16.

If the Fish & Wildlife Service determines that the action may jeopardize the species or result in the adverse modification of critical habitat, it must inform the agency of the "reasonable and prudent alternatives" that should be implemented to minimize the impact on the species. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h). The agency must then determine whether it can still take the action, or an alternative, while ensuring that the species will not be jeopardized or have its habitat adversely modified, or whether it must apply for an exemption. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.15(a).

The Endangered Species Act also requires the Fish & Wildlife Service to develop recovery plans for each threatened and endangered species. 16 U.S.C. § 1533(f). Although "recovery plans do not have the force of law," and so federal agencies do not *necessarily* have to comply with them, consistency with such plans is a factor to consider in determining whether approval of an agency action was arbitrary or capricious. *See Cascadia Wildlands v. Thrailkill*, 49 F. Supp. 3d 774, 2014 WL 4724855, at *12-13 (D. Or. Sept. 23, 2014); *see also Friends of Blackwater v. Salazar*, 691 F.3d 428, 434 (D.C. Cir. 2012) ("[A] recovery plan, even if not binding, so long as the species is endangered provides 'objective, measurable criteria' by which to evaluate the Service's progress toward its goal of conserving the species.").

**B. Defendants Did Not Violate the Endangered Species Act**

**1.      Defendants' consultation was not improper**

Plaintiff's first argument is that Defendants violated the Endangered Species Act by not following the proper consultation procedure. As noted above, the Forest Service did not request the Fish & Wildlife Service to prepare a biological opinion; rather, the Fish & Wildlife Service independently decided to prepare one, because of the Project's proximity to other projects. Plaintiff argues that it was a violation for the Fish & Wildlife Service to undertake "formal consultation" without a request from the Forest Service, because such consultation "must be initiated by the action agency." Mot. at 25.

Plaintiff misunderstands what is required by the consultation procedure. There is no requirement that the Fish & Wildlife Service can only prepare a biological opinion when requested to do so by another agency. To the contrary, "The [Fish & Wildlife Service] may use the results of the biological assessment in (i) determining whether to request the Federal agency to initiate formal consultation or a conference, [or] (ii) formulating a biological opinion . . . ." 50 C.F.R. § 402.12(k)(2). The regulations allow the Fish & Wildlife Service to prepare a biological opinion based on the biological

United States District Court
Northern District of California

assessment, even if not requested to do so by the agency; this is exactly what happened in this case.

Also, although a federal agency *may* initiate formal consultation through a written request submitted to the Fish & Wildlife Service, the agency "need not initiate formal consultation" if, as the result of a biological assessment or informal consultation, the Fish & Wildlife Service concurs that the proposed action is not likely to adversely affect any listed species or habitat.  50 C.F.R. § 402.14(b).  Here, the Forest Service did not need to initiate formal consultation, because the Fish & Wildlife Service determined in its biological opinion that "the proposed action is not likely to jeopardize the continued existence of the northern spotted owl or result in adverse modification of designated critical habitat for the northern spotted owl," and therefore concurred with the conclusion of the biological assessment.  FWS000637; FS001407.  It does not matter that the Forest Service did not request formal consultation, because the Fish & Wildlife Service found that the Project would not put the Owl or its habitat in jeopardy.

Plaintiff seeks a hyper-technical interpretation of the regulations to gloss over the fact that the Forest Service did not need to initiate formal consultation in this case.  Plaintiff's interpretation is incorrect, and Defendants performed a more thorough environmental review than what was required by the regulations.  Defendants' actions were consistent with the law; they were not arbitrary or capricious.  Plaintiff's first Endangered Species Act challenge fails.

## 2.    Defendants used the best scientific data available

Plaintiff's next argument is that Defendants failed to consider the "best scientific data available," as required by the Endangered Species Act, because they did not adopt the recommendations of a White Paper on Owl behavior.  Mot. at 25-26.  Specifically, Plaintiff raises three objections: (1) Defendants should have adopted guidelines that required Owl "core areas" (i.e., ranges surrounding known nest locations) to include 60-70 percent nesting habitat, and 30-40 percent foraging habitat, rather than the 48 and 28

United States District Court
Northern District of California

1    percent requirements that Defendants adopted; (2) Defendants should have defined high-

2    quality nesting habitat as containing trees with a diameter greater than 15 inches; and (3)

3    Defendants should have required core areas to contain 85% canopy closure, rather than

4    60% canopy closure. *Id.*

5        The threshold, and determinative, flaw in Plaintiff's argument is that Defendants

6    plainly did consider all of the scientific data about which Plaintiff complains. Each of the

7    recommendations described above was included in the administrative record, and

8    Defendants cited this research in the biological assessment and biological opinion. *E.g.*,

9    FS001353; FS003215-16; FWS000633, 48, 87. Plaintiff therefore cannot argue that

10   Defendants failed to consider the best scientific data available. *Conservation Cong. v.*

11   *Finley*, 774 F.3d 611, 620 (9th Cir. 2014) ("[D]eclining to adopt particular

12   recommendations in a recovery plan or a study – neither of which is binding on an agency

13   – does not constitute failing to consider them under 50 C.F.R. § 402.16.").

14       Because it is clear that Defendants considered the required data, Plaintiff also

15   argues that, having considered this data, Defendants should have come to a different

16   conclusion. This argument also fails. An agency action should be affirmed if a reasonable

17   basis exists for its decision. *Indep. Acceptance Co.*, 204 F.3d at 1251. Courts are at their

18   most deferential when reviewing scientific judgments within an agency's area of expertise.

19   *Conservation Cong.*, 774 F.3d at 617.

20       Plaintiff's first objection fails because its preferred habitat levels are based on a

21   single predictive model, and Defendants reasonably based their conclusion on the average

22   over all models, not just the one that Plaintiff prefers. FS00315-16; FS015581.

23   Defendants do not need to adopt the recommendations from the single most protective

24   model, so long as they consider them. *Conservation Cong.*, 774 F.3d at 620.

25       Plaintiff's second objection fails because Defendants based their habitat definitions

26   on the broadly accepted Forest Plan and Recovery Plan definitions, which have been in

27   place since 1995 and 2011, respectively. FS015576. The White Paper definition of high-

28   quality habitat, by contrast, was designed for use on private lands in the Klamath interior

United States District Court
Northern District of California

region, and research indicates that Owls in the two regions "use very different habitat for nesting . . . ." FS015580. It was reasonable for Defendants to conclude that the geographic focus of the White Paper limited its application in the Forest. Also, using Plaintiff's proposed definition would over-estimate the amount of available habitat because it would include smaller trees that Owls tend to avoid. FS015580-81.

And Plaintiff's third objection fails because its recommendation of 85% canopy cover is based on only a small sample in one study, whereas Defendants' requirement of 60% canopy closure comes from the Forest Plan itself. *See* FS015581. Defendants are not required to tailor their habitat definitions to the findings of a single study, so long as they *consider* the relevant research and their ultimate conclusions are reasonable. *Conservation Cong.*, 774 F.3d at 620.

Defendants' conclusions are reasonable, not arbitrary or capricious. Not only did they consider the best scientific data available, as they were required to, but they reasonably articulated connections between that data and their conclusions. Plaintiff's second Endangered Species Act challenge therefore fails.

### 3.    Defendants reasonably concluded that thinning would not harm the Owl

Plaintiff's next argument is that it was arbitrary or capricious for Defendants to conclude that thinning the Owl habitat in the Project will not result in the "downgrade" of any habitat. Plaintiff argues that Owls prefer dense, old-growth forest, and by removing trees from the forest, Defendants will harm the quality of Owl habitat.

In the Six Rivers National Forest generally, and for the Project specifically, Defendants classify Owl habitat based on the definition in the Forest Plan. FS015576. The Forest Plan defines "suitable" Owl habitat as forest stands with 60-70% canopy closure or greater and containing large, live coniferous trees with deformities; and an overstory consisting of trees of at least 21 inches diameter at breast height. FS018298.

The Forest Service considers this definition to be "consistent with" the 2011 Owl Recovery Plan, which defines "high-quality habitat" as:

10

United States District Court
Northern District of California

> Older, multi-layered structurally complex forests that are characterized as having large diameter trees, high amounts of canopy cover, and decadence components such as broken-topped live trees, mistletoe, cavities, large snags, and fallen trees.  This is a subset of spotted owl habitat and specific characteristics may vary due to climatic gradients and abiotic factors across the range.

FS016003; *see also* FS015576 (finding the Forest Plan definition "is also consistent with the 2011 NSO Recovery Plan").

For the Project, "[t]he stands selected for treatment minimally met the definition of suitable NRF habitat, but had a lower likelihood [of] contributing to survivorship or reproduction.  The stands had one or more features of suitable habitat, but lacked other important characteristics that reduce their likelihood of occupancy or use." FS001384.  At oral argument, Defendants explained that habitat that has some, but not all, of the features of high-quality habitat is considered "low-quality" habitat.

The Fish & Wildlife Service also has regulations defining the primary constituent elements of Owl habitat, which for nesting/roosting habitat include:

> Stands for nesting and roosting that are generally characterized by:
> (i) Moderate to high canopy cover (60 to over 80 percent);
> (ii) Multilayered, multispecies canopies with large (20-30 in (51-76 cm) or greater dbh) overstory trees;
> (iii) High basal area (greater than 240 ft$^2$/ac (55 m$^2$/ha));
> (iv) High diversity of different diameters of trees;
> (v) High incidence of large live trees with various deformities (e.g., large cavities, broken tops, mistletoe infections, and other evidence of decadence);
> (vi) Large snags and large accumulations of fallen trees and other woody debris on the ground; and
> (vii) Sufficient open space below the canopy for northern spotted owls to fly.

77 Fed. Reg. 71,876, 71,907 (Dec. 4, 2012) (codified at 50 C.F.R. pt. 17).  Although the Fish & Wildlife Service definition above is written so that no single factor is necessary to the habitat, it is important to note that nesting habitat is "generally characterized by" high basal area (i.e., the fraction of an area of land occupied by trees).  *Id.*

The Ninth Circuit recently rejected Plaintiff's argument that thinning Owl habitat below the recommended tree density necessarily constituted adverse modification of habitat, because tree density is only one factor among several to be considered in a general

11

United States District Court
Northern District of California

1  characterization of habitat.  *Conservation Cong. v. U.S. Forest Serv.*, 720 F.3d 1048, 1057

2  (9th Cir. 2013).  In that case, the court held that some of the same defendants as in this

3  case did not act arbitrarily or capriciously in concluding that thinning 22 acres of foraging

4  habitat to a basal area of approximately 80% of the recommendation was not an adverse

5  modification, deferring to the agencies' determination that this would not appreciably

6  diminish the value of the habitat area.  *Id.*

7        Here, Defendants found that the Project would not impair the area's ability to

8  support the Owl population.  FWS000634.  They stated that, apart from a negligible

9  amount of habitat removed for temporary roads, "[a]ll current habitat function will be

10  maintained in the treated areas," and that "all important components of [Owl habitat] will

11  be maintained in all treatment areas."  FS001408.  Defendants based this conclusion on the

12  facts that "[n]o treatments will occur within high quality nesting/roosting habitat to

13  maintain substantially all of the older and more structurally complex multi-layered conifer

14  forests;" 60% canopy cover will be maintained; and "[n]o predominant or potential nest

15  trees will be removed."  *Id.*  Moreover, "'adequate alternative habitat' . . . remains

16  available in the [action area] for owl use."  FS001384.

17        It is true, as Plaintiff argues, that none of the Project design features include

18  maintaining a high basal area in treated areas.  *See id.*  To the contrary, where commercial

19  timber harvesting will occur (including, apparently, in nesting/roosting habitat), the Project

20  sets target basal areas between 80 and 200 $ft^2$/acre, significantly below the Fish & Wildlife

21  Service regulations' recommendation of a basal area "greater than 240 $ft^2$/ac" for

22  nesting/roosting habitat.  *Compare* FS000252 *with* 77 Fed. Reg. at 71,907.

23        However, Defendants' habitat classifications were based on the Forest Plan and the

24  2011 Owl Recovery Plan, which do not include basal area metrics.  Plaintiff has not

25  demonstrated that it was unreasonable for Defendants to use those definitions.  The Forest

26  Plan definition has been in place since 1995, and the Recovery Plan definition since 2011.

27  A team of biologists evaluating the Project concluded that the Forest Plan definition "is

28  still valid" and "is based on best available science".  FS015576.  And the Fish & Wildlife

Service regulations do not *require* a high basal area; rather, they include high basal area as one factor in several to be considered in a "general[] characteriz[ation]." 77 Fed. Reg. at 71,907.  The Court sees nothing unreasonable about Defendants' classifications.

Plaintiff also has not demonstrated that it was unreasonable for Defendants to conclude that, under the Forest Plan and Recovery Plan classifications, thinning from below in areas of low-quality habitat to the target basal areas would not downgrade any Owl habitat.  The targeted habitat is low-quality, meaning that it had some but not all of the features of high-quality habitat.  Based on the proposed conservation measures (*e.g.*, maintaining 60% canopy closure, selectively targeting the smallest trees, avoiding predominant trees, etc.), it is reasonable to conclude that all of the treated habitat will still have some, but not all, of the features of high-quality nesting/roosting habitat post-treatment, and therefore no downgrade will occur.

Moreover, Defendants reasonably found that the Project will actually improve Owl habitat in the longer term.  "[L]ow thinning reduces competition between trees for light, water and nutrients . . . accelerat[ing] the development of late-mature forest structure . . . ." Cross-Mot. at 20 (citing FS001384-86; FWS000626).  Thinning trees will allow more sunlight to reach the forest floor, encouraging the type of understory vegetation that favors Owl prey.  FS001384.  Post-treatment analysis of two other recent projects demonstrated that low thinning does, in fact, improve Owl habitat quality.  FS001352.

For all of these reasons, it was reasonable to conclude that the Project will not downgrade Owl habitat, even though it reduces tree density in some areas below the Fish & Wildlife Service regulations' recommendation.  Plaintiff's third Endangered Species Act challenge fails.

## 4.     The Project adequately monitors the effects of the Barred Owl

As a final Endangered Species Act challenge, Plaintiff argues that the Project does not adequately monitor its effects on the Owl as a result of invasive Barred Owl activity. Mot. at 28.  As noted above, the Fish & Wildlife Service promulgated a Recovery Plan for

United States District Court
Northern District of California

the Owl in 2011, and federal action may be arbitrary and capricious if it is inconsistent with a recovery plan. *Cascadia Wildlands*, 2014 WL 4724855, at *12. The Recovery Plan instructs agencies to develop protocols to detect and monitor Barred Owl activity. FS015385. Plaintiff argues that the biological assessment and opinion "do not include the most basic monitoring for the detection of barred owls," as contemplated by the Recovery Plan. Mot. at 29.

Defendants argue that Plaintiff simply misunderstands the Project, because Northern Spotted Owl surveys have been designed to detect Barred Owl activity, and such surveys will be conducted during the project. FS013585; *see also* FS001402 ("Updated surveys will be maintained throughout the life of the project . . . .").

The use of Owl protocol surveys to monitor threats from the Barred Owl is not inconsistent with the Recovery Plan. Moreover, even if Barred Owl monitoring were not included in the Project, this would not be enough to render Defendants' approval of the Project arbitrary or capricious. As noted above, Defendants are not required to implement the actions in the Recovery Plan in a project, so long as their overall conclusion, that the project will not jeopardize the species, is reasonable. Here, Defendants reasonably concluded that the Project would improve the Owl's chance of survival relative to the Barred Owl, because it would encourage the growth of habitat that is favorable to the Owl and unfavorable to the Barred Owl. FS001367. The approval of the project was not arbitrary or capricious. Plaintiff's final Endangered Species Act challenge therefore fails.

## II.   PLAINTIFF'S NATIONAL FOREST MANAGEMENT ACT CHALLENGES FAIL

Plaintiff's next set of challenges to the Project are based on the National Forest Management Act. Plaintiff alleges that the Project is inconsistent with the Forest Plan, giving rise to Defendants' liability, in five ways: (1) Defendants analyzed the effects of the Project within a 0.5 mile radius of each Owl nest, instead of the 0.7 mile radius required by the Forest Plan; (2) Defendants implemented a 70 acre protected area around each Owl

14

nest, instead of the 100 acres required by the Forest Plan; (3) the Project improperly allows reductions in Northern Goshawk habitat; (4) the Project will contribute sediment to streams in violation of water regulations; and (5) the Project improperly allows for harvesting trees in protected areas near streams.  All of Plaintiff's National Forest Management Act claims fail.

**A.  National Forest Management Act Requirements**

The National Forest Management Act requires the Forest Service to develop forest plans for each National Forest.  16 U.S.C. § 1604(a).  "These plans operate like zoning ordinances, defining broadly the uses allowed in various forest regions, setting goals and limits on various uses (from logging to road construction), but do not directly compel specific actions . . . ."  *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 966 (9th Cir. 2003).  However, individual Forest Service projects must be consistent with the relevant forest plan.  16 U.S.C. § 1604(i).

The Forest Service's determination that a particular project is consistent with the relevant plan "is accorded substantial deference" by a reviewing court.  *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1099 (9th Cir. 2003).  A court "will conclude that the Forest Service acts arbitrarily and capriciously only when the record plainly demonstrates that the Forest Service made a clear error in judgment in concluding that a project meets the requirements of the NFMA and relevant Forest Plan."  *Earth Island Inst. v. Carlton*, 626 F.3d 462, 470 (9th Cir. 2010) (emphasis removed) (citation and quotation marks omitted).

**B.  Defendants' Actions Were Consistent With the Forest Plan**

Plaintiff brings five challenges to the Project under the National Forest Management Act.  Each of these challenges fails, because Defendants' actions were consistent with the Forest Plan, as discussed below.

United States District Court
Northern District of California

### 1.     Defendants reasonably used a 0.5 mile radius for analysis of Owl habitat

Plaintiff's first challenge is that Defendants' decision to analyze Owl habitat within 0.5 miles of known nest sites, rather than 0.7 miles, was inconsistent with the Six Rivers Forest Plan.  Mot. at 29.  The Forest Plan states, in relevant part, that "Formal consultation, requesting an incidental take permit be issued by the USFWS, is currently required to reduce suitable habitat below 500 acres within 0.7 miles, and/or below 1,340 acres with 1.3 miles of nests or activity centers."  FS017130.  In their environmental review of the Project, Defendants stated that "According to Service (and SRNF) guidelines, within 0.5 mile of spotted owl activity centers, there should be 250 acres of nesting and roosting habitat and 150 acres of foraging habitat to maintain the activity center," and that "All of the treated acres will be maintained (i.e., no habitat removal or downgrading) as suitable nesting and roosting or foraging habitat post-treatment."  FS015650-51.  Plaintiff argues that using 0.5 miles as the relevant range, rather than 0.7 miles, was inconsistent with the Forest Plan.

Plaintiff misunderstands the requirements of the Forest Plan, in several ways.  First, and most importantly, the requirement in the Forest Plan to which Plaintiff refers merely states that formal consultation is required "to reduce suitable habitat" within the specified range, but here, Defendants found that there will be no reduction in suitable habitat in the entire Project area, apart from the negligible amount removed for temporary roads and helicopter landings.  As discussed in the Endangered Species Act section above, this conclusion was reasonable, and it is therefore irrelevant whether Defendants looked for reductions in a 0.5 or 0.7 mile radius – there were none to find.

Second, even if the Project would reduce habitat within 0.7 miles of an Owl nest, the reduction would only oblige the agencies to complete "formal consultation."  FS017130.  Here, the Fish & Wildlife Service *did* perform formal consultation, by preparing a biological opinion in which it found that no adverse habitat modification or incidental take would occur.  FWF000638.  Because of this determination, no incidental take permit was required.  *See* FS017130; *see also* 16 U.S.C. § 1539(a)(1)(B).  Plaintiff

1    cannot complain about Defendants' threshold, because Defendants did what Plaintiff

2    alleges they needed to do if that threshold were crossed.  Indeed, at oral argument, Plaintiff

3    admitted that there would have been neither a procedural nor a substantive difference in

4    the environmental review process had Defendants used the 0.7 mile radius it seeks.

5         Finally, Defendants reasonably relied on current research in using a 0.5 mile radius

6    instead of the 0.7 mile radius in the Forest Plan.  The Forest Service explained this

7    decision in its biological assessment:

8              In the past, the SRNF required that 500 acres of
             nesting/roosting (N/R) be maintained within 0.7 mi in the
9             threshold analysis. Evidence presented in the white paper
             indicated that the highest use areas were within 0.5 mi of the
10            nest and contained a combination of nesting/roosting and
             foraging habitat. The white paper found that the relationship of
11            N/R to F is important in predicting NSO presence.
             The evidence presented in the white paper strongly
12            supports the use of 0.5 mi core analysis area for the Six Rivers.
             . . . Other studies also suggest that 0.5 miles is a biologically
13            meaningful scale to conduct a habitat analysis.

14   FS001353.

15        Defendants' decision to use a 0.5 mile radius for analysis was consistent with

16   multiple studies.  Defendants reasonably found that Owl habitat would not be reduced by

17   the Project.  And, the Fish & Wildlife Service prepared a biological opinion, as the Forest

18   Plan would require if habitat were actually to be reduced.  Defendants' actions were

19   consistent with the Forest Plan and were neither arbitrary nor capricious.

20

21   **2.     The Project protects more than 100 acres surrounding each Owl nest**

22        Plaintiff's next argument is that the Project is inconsistent with the Forest Plan

23   because it only includes a 70 acre protected area around each nest site.  Mot. at 30.  The

24   Forest Plan states that "The management direction in the Special Habitat Management

25   Area specifies the protection of 100 acres of owl habitat around all known owl activity

26   centers."  FS017130.  Plaintiff argues that Defendants violated this requirement, because at

27   various points in their environmental review, they refer to a protection area of just 70

28   acres.  *E.g.*, FS001363 ("No treatments would occur within a 70 acre minimum nest grove

17

around a known spotted owl activity center."); FS001367 ("In addition, the LRMP requires a nest grove protection zone.  In this project we used a minimum of 70 acres around each known AC, which was incorporated into the project design.  No activities will occur within the 70 acre nest groves.").

Despite this language apparently indicating that Owl nests will only receive a 70 acre protection area, Defendants actually designated over 100 acres of protected area for each Owl nest.  FS001396.  Defendants have therefore satisfied the Forest Plan requirement that 100 acres be protected around each nest.

Defendants explain this seemingly inconsistent aspect of their environmental review as referencing a separate Fish & Wildlife Service guideline requiring a 70 acre protected area around Owl nests.  Cross-Mot. at 26 (citing FWS000627).  However, the "guideline" that Defendants cite appears to be the Forest Service's own proposed conservation measure for the Project.  *Compare* FWS000627 *with* FS000592.  At oral argument, Defendants explained that their references to a 70-acre nest grove were made in the context of a 1990 Endangered Species Act guideline.  Regardless of the reason for the 70-acre references, the fact remains that the Project does protect more than 100 acres for every Owl nest.  The Project is therefore consistent with the Forest Plan, and Plaintiff's second Forest Management Act challenge fails.

### 3.    The Project will not reduce Northern Goshawk habitat

Plaintiff's next argument is that the Project will result in the reduction of Northern Goshawk habitat, in contravention of the Forest Plan.  Mot. at 31-32.  Although not listed under the Endangered Species Act, the Goshawk is a "sensitive" species that receives protection under the Forest Plan.  FS017011.  As with the Owl, the Forest Plan requires the Service to maintain certain levels of suitable habitat around each known Goshawk nest.  FS017131.  "Suitable habitat amounts in all zones of all three territories are below those prescribed by the Forest Plan."  FS000316.  Plaintiff argues that the Project will further

United States District Court
Northern District of California

1    reduce Goshawk habitat below these required levels, and it is therefore inconsistent with

2    the Forest Plan.

3          Plaintiff mistakenly argues that the Project will reduce Goshawk habitat.  As with

4    the Owl, discussed above, Defendants found that virtually no Goshawk habitat will be

5    reduced by the Project.  Cross-Mot. at 27 (citing FS000318-20).  Defendants found that

6    "The Kelsey Peak Project would maintain current existing habitat within the territory and

7    accelerate the development of additional suitable habitat."  FS000318.  Although very

8    small amounts of habitat would be removed for temporary roads, Defendants concluded

9    that such minor and temporary removal was "not expected to impact habitat suitability of

10   the existing forest stand."  FS000319.

11         In fact, Defendants found that the Project would accelerate habitat growth by

12   reducing competition among trees, and also protect Goshawk habitat from destructive

13   wildfires.  FS000318-19.  Because Defendants reasonably concluded that the Project will

14   not reduce Goshawk habitat, and will actually increase it, the Project is not inconsistent

15   with the Forest Plan.  Plaintiff's third Forest Management Act challenge therefore fails.

16

17   **4.      The Project complies with the applicable water regulations**

18         Plaintiff's next argument is that the Project is inconsistent with the Forest Plan

19   because it will deposit additional sediment in streams in the Forest in violation of water

20   regulations.  Mot. at 32.  Sediment deposits in the Forest already exceed state water quality

21   standards.  FS0000226.  The Forest Plan sets a goal of achieving state water quality

22   standards by designing and implementing "best management practices" for activities that

23   will disturb land and deposit sediment.  FS017093; FS017101.  Plaintiff argues that the

24   Project is inconsistent with the Forest Plan because it will contribute additional sediment to

25   the streams, thereby undermining the goal of achieving state water quality standards.  Mot.

26   at 32-33.

27         Plaintiff misunderstands Defendants' water quality obligations under the Forest

28   Plan.  The Forest Plan does not prohibit activities that contribute sediment; rather, it

United States District Court
Northern District of California

1    requires that "best management practices" be implemented for such activities.  FS017093;

2    FS017101.  Defendants proposed 17 such best practices related to "Soil, Water, [and]

3    Fish" for the Project in this case, including restricting ground equipment to lands with

4    slopes less than 35%, restricting temporary road construction to the dry season, shaping

5    roads and landings to disperse drainage, and implementing other erosion control measures.

6    FS000236-37.

7         In addition to implementing best management practices, Defendants also stated

8    their intention to comply with a Waiver from the discharge limits that would otherwise

9    apply to the Project.  FS000418.  There is a standing Waiver of discharge requirements on

10   National Forest lands along the northern California coast.  FS001767 *et seq*.  So long as

11   Defendants comply with the Waiver, they are in compliance with the applicable sediment

12   deposit standards.  FS001775.  At oral argument, Defendants indicated that their

13   application to enroll the Project in the Waiver was approved on April 29, 2014.  Plaintiff

14   has given the Court no reason to believe that Defendants are out of compliance with the

15   Waiver.

16        Because Defendants implemented best management practices to reduce sediment

17   deposits from the Project, they have complied with the Forest Plan.  Moreover, Defendants

18   appear to be in compliance with the applicable water quality standards, because the Project

19   is covered by a Waiver of those standards.  For these reasons, Plaintiff's fourth Forest

20   Management Act challenge fails.

21

22   **5.    Timber harvesting is allowed within riparian reserves**

23        Plaintiff's final Forest Management Act challenge is that the Project improperly

24   allows timber harvesting within riparian reserves, or protected areas near streams.  Mot. at

25   33-34.  The Forest Plan generally prohibits timber harvest in riparian reserves, although

26   there are several exceptions.  FS017981-82.  The Project includes lumber harvesting in the

27   outer 80 feet of certain riparian reserves.  FS000160.  Plaintiff argues that the Forest Plan's

28

1    exceptions do not apply to the Project's planned harvesting activities, so these activities are

2    inconsistent with the Forest Plan and violate the Forest Management Act.

3         As noted, the Forest Plan includes exceptions to the general prohibition on timber

4    harvesting in riparian reserves.  These exceptions include timber harvesting activities "to

5    control stocking, reestablish and manage stands, and acquire desired vegetation

6    characteristics needed to attain Aquatic Conservation Strategy objectives."  FS017982.

7    Plaintiff argues that this exception does not apply here, because the primary stated

8    purposes of the Project are to provide timber commodities and create fire fuelbreaks,

9    neither of which are goals of the Aquatic Conservation Strategy.  Mot. at 34 (citing

10   FS000159).

11        Plaintiff misrepresents the Project's planned activities by referencing only the

12   highest-level Project goals in discussing the activities in riparian reserves.  The Forest

13   Service found that careful thinning in riparian reserves will "increase the average diameter

14   of the stand, and/or accelerate the development of the shade tolerant understory."

15   FS000259.  This would "assist in creation of late-successional conditions sooner and

16   provide for a faster development of large woody material sources for in-stream and

17   terrestrial habitat."  *Id.*  The Forest Service specifically found that the Project will meet

18   Aquatic Conservation Strategy objectives, by improving watershed and habitat conditions

19   in the long term, "with only minor short-term negative effects" from increased sediment

20   due to temporary road construction.  FS000419-24.

21        Plaintiff's argument boils down to the claim that the Project is inconsistent with the

22   Forest Plan because Defendants did not articulate any conservation goals among the

23   primary purposes of the Project.  But there is no requirement that these conservation goals

24   be articulated at the highest level of a project.  Defendants' choice not to list such purposes

25   does not change the fact that the Project will serve the conservation goals that Plaintiff

26   wants.  Defendants' actions are consistent with the Forest Plan and are not arbitrary or

27   capricious.  Plaintiff's final Forest Management Act challenge fails.

28

United States District Court
Northern District of California

United States District Court
Northern District of California

### III.    PLAINTIFF'S NATIONAL ENVIRONMENTAL POLICY ACT CHALLENGES FAIL

Plaintiff's final set of claims is based on the National Environmental Policy Act. This statute imposes a procedural, rather than substantive, burden on agencies before they take an action that may affect the environment, requiring them to take a "hard look" at the environmental consequences of the proposed action. *Native Ecosys. Council v. Weldon*, 697 F.3d 1043, 1051 (9th Cir. 2012). Plaintiff argues that Defendants failed to take the requisite "hard look," for three reasons: (1) Defendants did not consider a "reasonable range of alternatives" to the Project; (2) Defendants did not adequately consider the effects of the Project in the regional watershed; and (3) Defendants did not adequately consider the cumulative effects of off-highway vehicles and private logging activities that will occur along with the Project. Mot. at 34-38. Each of these challenges fails.

### A. National Environmental Policy Act Requirements

The National Environmental Policy Act establishes a process for federal agencies to evaluate the environmental consequences of "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). An agency proposing such an action must draft an environmental impact statement. 40 C.F.R. § 1508.11. This statement must "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated." 40 C.F.R. § 1502.14(a). The statement must also examine the direct, indirect and cumulative impacts of the proposed project. 40 C.F.R. §§ 1502.16, 1508.7, 1508.8.

The alternatives section is "the heart of the environmental impact statement." 40 C.F.R. § 1502.14(a); *Natural Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d 797, 813 (9th Cir. 2005). "The existence of a viable but unexamined alternative renders an environmental impact statement inadequate." *Natural Res. Def. Council*, 421 F.3d at 813 (quotation and citation omitted). However, there is no minimum number of alternatives

22

that an agency must consider beyond the proposed action and the alternative of doing nothing. *Native Ecosys. Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1246 (9th Cir. 2005). Also, "NEPA does not require a separate analysis of alternatives which are not significantly distinguishable from alternatives actually considered, or which have substantially similar consequences." *Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d 592, 602 (9th Cir. 2010) (quotation and citation omitted).

In *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800 (9th Cir. 1999), the Ninth Circuit rejected the Forest Service's analysis of alternatives to a land exchange between the Forest Service and a private party. 177 F.3d at 803. In that case, the Forest Service first considered six alternatives, but eliminated three without detailed study. *Id.* at 813. The remaining three included the required "no action" alternative, and two "virtually identical alternatives," that differed by only 141 acres. *Id.* The Forest Service did not consider any alternatives that reserved rights in the land for the public's interest, despite regulations requiring consideration of such an alternative. *Id.* at 814. Because of the small number of alternatives considered and the Forest Service's failure to consider a factor it was obligated to, the Ninth Circuit rejected the environmental impact statement. *Id.* at 813-14; *see also League of Wilderness Defenders-Blue Mountains Biodiversity Proj. v. U.S. Forest Serv.*, 689 F.3d 1060, 1071 (9th Cir. 2012) ("[A]n EIS analyzing in detail two action alternatives that differed only in proposed acreage would likely be inadequate.").

However, courts show significant deference to agency conclusions regarding the alternatives considered. *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 871 (9th Cir. 2004). For instance, in a case where a tribe and environmental organizations challenged a mining exploration project where only the full project and the no-action alternative were considered, the Ninth Circuit still upheld the environmental review, because the project's mitigation measures, such as stopping exploration if any new cultural resources were discovered, would have substantially similar environmental consequences to the plaintiffs' proposal of only approving the first phase of the project. *Te-Moak Tribe*, 608 F.3d at 601-02.

An environmental impact statement must also analyze the cumulative impacts of a proposed project.  "Cumulative impact is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions."  40 C.F.R. § 1508.7.  "Reasonably foreseeable future actions" are defined as "Those Federal or non–Federal activities not yet undertaken, for which there are existing decisions, funding, or identified proposals."  36 C.F.R. § 220.3.  "[U]nder NEPA [courts] defer to an agency's determination of the scope of its cumulative effects review."  *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1071 (9th Cir. 2002).

"Ordinarily, an agency has the discretion to determine the physical scope used for measuring environmental impacts.  However, the choice of analysis scale must represent a reasoned decision and cannot be arbitrary."  *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir. 2002).  In *Idaho Sporting Congress*, the Ninth Circuit invalidated the Forest Service's cumulative impact analysis of a logging project's effects on various species, because the Forest Service only analyzed the effects in the relatively small "home range" of each species, but the applicable Forest Plan stated that the habitat needs of the species "must be addressed at a landscape scale," and the Forest Service did not justify its contrary decision.  305 F.3d at 973-74.  So while courts will generally defer to reasonable agency determinations of geographic scope, they are skeptical of unjustified determinations that appear facially inconsistent with the agency's other statements.  *Id.*

On the other hand, where an agency provides a reasonable justification to use a geographic scope that is different than that it has used elsewhere, the agency's decision will generally be upheld.  *See Selkirk Conservation Alliance v. Forsgren*, 336 F.3d 944, 958-60 (9th Cir. 2003) (A smaller analysis area was appropriate where "expanding the analysis area would dilute the effects of the proposed project").

United States District Court
Northern District of California

24

**B. Defendants Satisfied the National Environmental Policy Act**

Plaintiff brings three challenges to the Project under the National Environmental Policy Act: (1) Defendants did not consider a "reasonable range of alternatives" to the Project; (2) Defendants unreasonably restricted the geographic scope of their analysis, and thereby failed to consider certain foreseeable impacts; and (3) Defendants unreasonably failed to consider certain private activity that will likely result from the Project. Each of these claims fails.

**1.      Defendants considered a reasonable range of alternatives**

Plaintiff's first argument is that Defendants failed to consider a reasonable range of alternatives to the Project. In the draft environmental impact statement, the Forest Service initially considered six alternatives: five alternative projects and a no-action alternative. FS000579-83. Two of the project alternatives were eliminated without detailed consideration because they did not satisfy either the timber quantity or conservation requirements of the Project. FS000579. The draft environmental impact statement therefore considered four alternatives in detail, including: (1) taking no action; (2) a modification to the original proposal, setting aside additional acreage to protect the Owl; (3) an alternative that did not include any new temporary roads and reduced the overall acreage of the Project; and (4) an alternative that would use a more intensive logging method on a portion of the proposed acreage. FS000580-83.

The final environmental impact statement eliminated the fourth alternative discussed above after new Owl surveys indicated that the more intensive logging method would adversely affect Owl habitat. FS000209; FS000227. The final environmental impact statement considered the remaining three alternatives in detail. FS000228-229.

Plaintiff argues that Defendants did not consider a reasonable range of alternatives, for two reasons. First, Plaintiff argues Defendants did not consider a sufficient number of alternatives. Mot. at 34. Second, Plaintiff argues Defendants unreasonably failed to consider a specific alternative that it suggested. Mot. at 35. Both of these arguments fail.

United States District Court
Northern District of California

United States District Court
Northern District of California

Plaintiff's argument that Defendants did not consider enough alternatives fails because there is no minimum number of alternatives that an agency must consider beyond the proposed action and the alternative of doing nothing. *Native Ecosys. Council v. U.S. Forest Serv.*, 428 F.3d at 1246. It is true, as Plaintiff argues, that in *Muckleshoot Indian Tribe*, the Ninth Circuit invalidated an environmental impact statement that only considered a no-action alternative and two somewhat similar action alternatives. 177 F.3d at 813. However, in that case, the Forest Service failed to consider any alternative that would reserve the public's rights in the conveyed land; it was the combination of the small number of alternatives and the appearance that the Forest Service was shirking its duty that caused the Ninth Circuit to disturb the agency's decision. Here, to the contrary, there is nothing in the record suggesting that the Forest Service ignored its obligations.

Plaintiff's second argument, that the Forest Service should have considered an alternative with a specific limit on the diameter of trees to be cut, fails because this alternative is substantially similar to the proposed action. Just as in *Te-Moak Tribe*, where the plaintiffs' suggested plan was found to be substantially similar to the mitigation measures already in place, 608 F.3d at 602, Plaintiff's suggested diameter limit here would have largely the same effects as Defendants' plan to "thin from below," which involves thinning the smallest diameter trees first until the desired forest characteristics are achieved. FS000230. The Project does use tree diameter measurements to target logging, but only as guidelines, not as strict limits. *See id.* Defendants argue that the flexibility of guidelines makes sense, because in some cases, preserving large-diameter trees could undermine the Project's objectives, by preventing trees from being "removed to increase growth of adjacent trees and to meet the desired residual stand density." FS000230. Also, while the Forest Service did not consider Plaintiff's suggestion in detail, it did respond to the suggestion at the final comment stage, and stated that "A diameter cap is generally arbitrary and not based on achieving a resource objective." FS000492.

Plaintiff argues that Defendants' stated explanation is unreasonable, because other Forest Service and Fish & Wildlife Service regulations do use diameter measurements, for

United States District Court
Northern District of California

1  example in defining desirable habitat attributes.  *E.g.*, 77 Fed. Reg. at 71,907.  However,

2  Plaintiff misunderstands Defendants' explanation.  While tree diameter is one factor that is

3  related to desirable habitat, it may not correspond perfectly, for the reasons stated above,

4  such as where too many large-diameter trees are crowding an area.  For this reason, it may

5  be appropriate to remove some trees above a certain diameter in order to promote the

6  health of the forest in that area.  FS000230.  Although Defendants' brief explanation

7  appears at first to be in some tension with these other regulations, the explanation makes

8  sense in light of the fact that too many large trees in an area can have negative

9  consequences for forest health.

10  Defendants also argue that Plaintiff waived this challenge by failing to offer its

11  suggestion during the "scoping" phase of the Project.  Cross-Mot. at 36.  Plaintiff offered

12  its alternative during the comment phase after the draft environmental impact statement

13  was published.  FS014869.  This was not too late; Defendants were obligated to consider

14  the alternative at that time, so long as it was reasonable.  *Lathan v. Volpe*, 350 F. Supp.

15  262, 265 (W.D. Wash. 1972) ("The proper response to comments which are both relevant

16  and reasonable is to either conduct the research necessary to provide satisfactory answers,

17  or to refer to those places in the impact statement which provide them."), *vacated in part*

18  *on other grounds by Lathan v. Brinegar*, 506 F.2d 677 (9th Cir. 1974).  Defendants

19  admitted as much at oral argument.

20  Nonetheless, Defendants' brief discussion and ultimate rejection of Plaintiff's

21  proposed alternative were not arbitrary or capricious, because the Project uses tree

22  diameter in a way that more flexibly promotes forest health than would a strict diameter

23  cap.  Plaintiff's first National Environmental Policy Act challenge therefore fails.

24

25  **2.**      **Defendants reasonably determined the geographic scope of their analysis**

26  Plaintiff's next argument is that Defendants unreasonably restricted the geographic

27  scope of their analysis, and thereby excluded certain environmental consequences from

28  consideration.  Mot. at 36-37.  Plaintiff complains that Defendants analyzed water quality

United States District Court
Northern District of California

1    and off-highway vehicle effects at the local "6th-field watershed" level, rather than the

2    regional "5th-field watershed" level.  Plaintiff argues that, in other places, such as the

3    Forest Plan and elsewhere in the final environmental impact statement, the Forest Service

4    uses the larger 5th-field level for its analysis.  *Id.*  Plaintiff argues that these

5    inconsistencies prevented Defendants from considering all of the cumulative effects of the

6    project.  *Id.*

7           Plaintiff's argument fails because, first, Defendants are not obligated to use the

8    same geographic scope for different analyses, and second, Defendants articulated a sound

9    explanation for using the 6th-field analysis for water quality effects.  As noted above,

10   courts generally defer to agency determinations of geographic scope of their analysis,

11   unless the agency's determination is unjustified and clearly inconsistent with the agency's

12   own guidelines.  *Idaho Sporting Cong.*, 305 F.3d at 973.  Here, the Forest Service

13   determined that:

> Using the entire 5th-field watershed with the ERA [Equivalent
> Roaded Acres] model would dilute the effects of the set of
> projects that are occurring and are planned for the Upper and
> Lower Mad River 6th-field watersheds by adding Ruth Lake
> 6th-field watershed where no recent large projects have
> occurred or are likely to occur within the reasonably
> foreseeable future.

18   FS000405.  Defendants used a smaller geographic area for one of their watershed models

19   because a larger area would "dilute" the effects of the Project.  Avoiding the dilution of

20   environmental impacts is a reasonable justification for using a smaller area in the

21   applicable analyses.  *Selkirk*, 336 F.3d at 960.

22          In fact, the provision Plaintiff cites for the alleged inconsistency here states that

23   "While the '5th field watershed' is what is usually referred to in guiding documents, other

24   factors may override."  FS016168.  The relevant guidelines here *explicitly endorse* using

25   an analysis area other than the 5th-field watershed when appropriate, as the Forest Service

26   did here.  Defendants' analysis area was not arbitrary or capricious.

27

28

United States District Court
Northern District of California

### 3.    Defendants reasonably estimated indirect private activity

Plaintiff's final argument is that Defendants did not adequately consider the indirect effects of private road building and logging activity that are likely to result from the Project.  Plaintiff alleges that Defendants admitted that private road building and logging are likely to occur, but did not analyze them, and thereby failed to satisfy the National Environmental Policy Act's requirement that they consider all reasonably foreseeable effects.  Mot. at 37-38.

Plaintiff's argument fails, for two reasons.  First, Plaintiff attempts to shoehorn these activities into the required analysis by invoking dictionary definitions of "likely" and "foreseeable," but "reasonably foreseeable" is a term of art: "activities not yet undertaken, for which there are existing decisions, funding, or identified proposals."  36 C.F.R. § 220.3.  Plaintiff does not identify any particular private activities in the analysis area that meet this definition; indeed, Plaintiff cites the administrative record finding that "there is [sic] no known private timber harvesting plans on other ownerships in the harvest area."  In spite of this, Plaintiff faults Defendants for not including any such unknown activities in their analysis.  Because these unknown, private activities are not "reasonably foreseeable," Defendants did not need to include them in their analysis.  *See* 40 C.F.R. § 1508.7.

Plaintiff does point to one specific timber harvest plan that Defendants did not include in their analysis: the Wilcox plan.  Mot. at 38.  However, the Wilcox plan is located in the Shasta Trinity National Forest, not the Six Rivers National Forest; it is outside of both the 6th and 5th field watersheds that Defendants considered for the Project.  FS000494.  This project is far enough away that Defendants were not required to consider it.

Plaintiff's argument regarding private road-building fails for a second reason: even though Defendants did not need to include unknown private road activity in their analysis, they increased their estimate of road-building activity by 30% in their Equivalent Roaded Acres watershed model, in order to account for such unknown "ghost roads."  FS001571.

1   It appears that Defendants did exactly what Plaintiff argues they were supposed to do, at

2   least with respect to private road activity.

3          Plaintiff's final National Environmental Policy Act challenge fails, because

4   Defendants were not obligated to consider unknown activity, and they did not act

5   arbitrarily or capriciously in analyzing the activities that they did consider.

6

7   **IV.    PLAINTIFF IS NOT ENTITLED TO AN INJUNCTION**

8          Finally, Defendants argue that Plaintiff is not entitled to injunctive relief here.  An

9   injunction is appropriate if a plaintiff demonstrates:

> (1) that it has suffered an irreparable injury;
> (2) that remedies available at law, such as monetary damages,
> are inadequate to compensate for that injury;
> (3) that, considering the balance of hardships between the
> plaintiff and defendant, a remedy in equity is warranted; and
> (4) that the public interest would not be disserved by a
> permanent injunction.

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

15         As discussed above, Plaintiff has not shown how it has suffered *any* injury, much

16  less an irreparable injury.  Defendants satisfied all of their obligations under the

17  Endangered Species Act, National Forest Management Act, and National Environmental

18  Policy Act.  Plaintiff is not entitled to any relief, much less injunctive relief.

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

United States District Court
Northern District of California

**CONCLUSION**

Defendants met all of their environmental obligations for the Project by performing a thorough environmental review and developing a project that actually protects and improves Owl habitat, consistent with the Forest Plan.  Plaintiff's motion for summary judgment is DENIED.  Defendants' cross-motion for summary judgment is GRANTED. The clerk is directed to enter judgment and close the case.

**IT IS SO ORDERED.**

Dated:   05/07/15

THELTON E. HENDERSON
United States District Judge